1   EILEEN M. DECKER
    United States Attorney
2   LAWRENCE S. MIDDLETON
    Assistant United States Attorney
3   Chief, Criminal Division
    STEVEN R. WELK
4   Assistant United States Attorney
    Chief, Asset Forfeiture Section
5   FRANK D. KORTUM
    Assistant United States Attorney
6   California Bar No. 110984
        Federal Courthouse, 14th Floor
7       312 North Spring Street
        Los Angeles, California 90012
8       Telephone:  (213) 894-5710
        Facsimile:  (213) 894-7177
9       E-mail: Frank.Kortum@usdoj.gov

10  Attorneys for Plaintiff
    UNITED STATES OF AMERICA

11
                    UNITED STATES DISTRICT COURT
12
                FOR THE CENTRAL DISTRICT OF CALIFORNIA
13
                         EASTERN DIVISION
14
    UNITED STATES OF AMERICA,          No. EDCV 16-01129 JGB(JPRx)
15
                 Plaintiff,            **GOVERNMENT'S MEMORANDUM OF POINTS
16                                     AND AUTHORITIES IN RESPONSE TO THE
                      v.               COURT'S ORDER RE LEGAL BASES FOR
17                                     ISSUANCE OF ARREST WARRANT IN REM**
    ALL MONIES, INCLUDING INSURANCE
18  BENEFITS AND INTEREST, PAYABLE
    PURSUANT TO CLAIM NUMBER 1179068
19  UNDER MINNESOTA LIFE INSURANCE
    GROUP POLICY NO. 33772-G, FOR
20  BASIC LIFE INSURANCE COVERAGE IN
    THE AMOUNT OF $25,000, AND
21  SUPPLEMENTAL LIFE INSURANCE
    COVERAGE IN THE AMOUNT OF
22  $250,000,

23               Defendant.

24

25

26

27

28

**TABLE OF CONTENTS**

DESCRIPTION                                                                PAGE

TABLE OF AUTHORITIES..................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.   INTRODUCTION....................................................1

II.  ARGUMENT........................................................4

     A.   The Defendant Policy Benefits Are "Derived From" the
          Underlying Federal Crime of Terrorism.....................4

          1.   Congress Designed § 981(a)(1)(G)(iii) to Sweep
               Extremely Broadly, Covering All Assets Derived
               From a Terrorist Attack, Not Merely Proceeds.........5

          2.   The Plain Language of § 981(a)(1)(G)(iii) Is
               Broader Than Other Provisions In § 981 And Is Not
               Limited To Proceeds..................................8

          3.   Farook's Policy Benefits Have a Close Nexus With
               And Are Thus Derived From His Terrorist Crimes
               Under Any Standard..................................12

     B.   The Substantial Connection Test Does Not Apply to
          Forfeiture Claims Against Assets Derived From
          Terrorism.................................................14

     C.   If the Court Denies the Arrest Warrant In Rem, It Must
          Terminate the Case........................................17

III. CONCLUSION.....................................................18

i

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                 PAGE

FEDERAL CASES

Alyeska Pipeline Service Co. v. Vessel Bay Ridge,
    703 F.2d 381 (9th Cir. 1983)...................................17

Clapp v. Heiner,
    51 F.2d 224 (3d Cir. 1931).....................................9

Do Sung Uhm v. Humana, Inc.,
    620 F.3d 1134 (9th Cir. 2010)..................................9

Fleck v. KDI Sylvan Pools, Inc.,
    981 F.2d 107 (3d Cir. 1992)....................................9

Haig v. Agee,
    453 U.S. 280 (1981)............................................8

Hibbs v. Winn,
    542 U.S. 88 (2004).............................................7

Higa v. Transocean Airlines,
    230 F.2d 780 (9th Cir. 1956)...................................9

Humanitarian Law Project v. Reno,
    205 F.3d 1130 (9th Cir. 2000).................................11

Illinois v. Gates,
    462 U.S. 213 (1983)............................................4

Libretti v. United States,
    516 U.S. 29 (1995).............................................6

Marine Midland Bank v. United States,
    11 F.3d 1119 (9th Cir. 1993)...................................4

Penn Gen. Casualty Co. v. Pennsylvania,
    294 U.S. 189 (1935)...........................................17

Robinson v. Shell Oil Co.,
    519 U.S. 337 (1997)............................................7

Russello v. United States,
    464 U.S. 16 (1983)......................................7, 8, 11

United States v. Am. Trucking Ass'n,
    310 U.S. 534 (1940)............................................5

United States v. Angiulo,
    897 F.2d 1169 (1st Cir. 1990).................................12

**TABLE OF AUTHORITIES (CONTINUED)**

FEDERAL CASES                                                      PAGE

United States v. Bajakajian,
        524 U.S. 321 (1998).........................................11

United States v. Davenport,
        668 F.3d 1316 (11th Cir. 2012)...............................6

United States v. DeFries,
        129 F.3d 1293 (D.C. Cir. 1997)..............................12

United States v. Hassan,
        742 F.3d 104 (4th Cir. 2014)................................13

United States v. Havelock,
        664 F.3d 1284 (9th Cir. 2012)................................6

United States v. Horak,
        833 F.2d 1235 (7th Cir. 1987)...............................12

United States v. Melrose East Subdivision,
        357 F.3d 493 (5th Cir. 2004).................................4

United States v. Olfchinick,
        883 F.2d 1172 (3rd Cir. 1989)...............................12

United States v. One 1986 Ford Pickup,
        56 F.3d 1181 (9th Cir. 1995)................................16

United States v. One Parcel . . . 916 Douglas Ave.,
        903 F.2d 490 (7th Cir. 1990)................................16

United States v. Porcelli,
        865 F.2d 1352 (2d Cir. 1989)................................12

United States v. $125,938.62 Proceeds of Certificates of
        Deposit,
        537 F.3d 1287 (11th Cir. 2008)..............................15

United States v. Rahman,
        189 F.3d 88 (2d Cir. 1999)..................................13

United States v. Real Property Located at 475 Martin Lane,
        545 F.3d 1134 (9th Cir. 2008)................................5

United States v. Real Property Located at 5208 Los Franciscos
        Way,
        385 F.3d 1187 (9th Cir. 2004)................................4

United States v. Real Property 874 Gartel Drive,
        79 F.3d 918 (9th Cir. 1996)..................................4

**TABLE OF AUTHORITIES (CONTINUED)**

FEDERAL CASES                                                    PAGE

United States v. Real Property with any Improvements Thereon
        Located at 40 Clark Road, Sandisfield, Mass.,
        52 F. Supp. 2d 254 (D. Mass. 1999)...........................16

United States v. Santoro,
        866 F.2d 1538 (4th Cir. 1989)................................16

United States v. Ursery,
        518 U.S. 267 (1996)...........................................5

United States v. $62,552.00 in U.S. Currency,
        2015 WL 251242 (D. Mass. Jan. 20, 2015)......................16

United States v. $242,484.00 in U.S. Currency,
        389 F.3d 1149 (11th Cir. 2004)................................4

FEDERAL STATUTES

18 U.S.C. § 981.............................................passim

18 U.S.C. § 983(c)(3)....................................2, 14

18 U.S.C. § 1963........................................9, 12

OTHER AUTHORITIES

3A Sutherland, Statutory Construction (7th ed.)...................11

147 Cong. Rec. (2001).........................................6,8

Matthew Levitt, Hamas: Politics, Charity, and Terrorism in
        Service of Jihad 178 (Yale Univ. Press 2007)................11

Pub. L. No. 107-56, §§ 302(a)(8), (b)(1), (b)(3), 316, 320, 115
        Stat, 272 ....................................................9

Webster's Third New International Dictionary 608 (1961)............7

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.   INTRODUCTION**

At issue here are the life insurance benefits of Syed Rizwan Farook ("Farook"), a terrorist who died in the course of carrying out an attack in San Bernardino killing 14 people, injuring at least 22 others, and ending in a firefight with law enforcement on December 2, 2015 (the "San Bernardino Attack").

Farook -- an adherent and promoter of violent jihadist ideology that teaches "death while furthering jihad will result in martyrdom" -- began planning to commit violent attacks at least as early as 2011 and obtained life insurance coverage after initiating his plans, including after acquiring two of the firearms used on December 2nd. (Complaint ¶¶ 8, 12, 16, 19(f).)  He anticipated dying in the course of the attack that day, and his expectation proved correct.  (Id. ¶¶ 8, 15, 18, 19(g).)  In 2012 and 2013, Farook obtained substantial life insurance coverage so that when he died, his chosen beneficiary would receive $275,000 (the "Policy Benefits").  (Id. ¶ 20.)  The beneficiary was not Farook's wife -- with whom he would carry out the murderous attack (id. ¶ 19) -- but rather his mother, with whom Farook and his wife lived.  (Id. ¶ 18.)

Minutes after commencing the San Bernardino Attack, Farook's wife pledged allegiance in a Facebook post to the Islamic State of Iraq and the Levant ("ISIL").  (Id. ¶ 19(c).)  Farook and his wife did not flee after the initial shooting; instead, armed with a remote detonator for an explosive device Farook planted at the scene of the initial shooting, as well as with four firearms and thousands of rounds of ammunition, they circled the area in their SUV until they encountered law enforcement.  (Id. ¶ 19(d), (f)-(g).)  Farook and his

wife continued their rampage as they shot at law enforcement officers.  (Id. ¶ 19(e).)  As they expected, the couple died in the ensuing firefight that ended the attack.  (Id. ¶ 19(f).)  The Policy Benefits only became payable upon Farook's death.  (Id. ¶ 20.)

On May 31, 2016, the government filed a verified complaint for forfeiture of the Policy Benefits.  Contemporaneously, the government applied for an arrest warrant in rem to allow the government to take custody of the Policy Benefits and thereby perfect the Court's in rem jurisdiction in the forfeiture action.  The requested arrest warrant would authorize the government to hold the proceeds of the insurance policy until the Court resolves claims to the defendant assets.  On June 2, 2016, the Court issued an order (the "June 2 Order") directing the government to answer three questions regarding the requested warrant:

1.  What authority supports the government's contention that the allegations in the complaint, taken as true, establish probable cause to believe that the proceeds were "derived from" the terrorist act as required by 18 U.S.C. § 981(a)(1)(G)(iii)?

2.  Is the government required to establish, pursuant to 18 U.S.C. § 983(c)(3), that there is a "substantial connection" between the life insurance policy benefits and the terrorist act?  If so, how do the allegations in the complaint, taken as true, establish such a nexus?  If not, what nexus is required between the life insurance policy benefits and the terrorist act to establish that the proceeds were "derived from" the terrorist act?

3.     What authority does the Court have, if any, to exercise jurisdiction over the life insurance policy benefits if the warrant does not issue?

As discussed more fully below, the rules of statutory construction make clear that Congress deliberately wrote the term "derived from" in § 981(a)(1)(G)(iii) to be interpreted as broadly as possible.  In fact, in the immediate aftermath of the September 11, 2001, terrorist attacks, Congress enacted a sweeping expansion of federal forfeiture law designed to ensure the government's ability to eradicate terrorists' financing and financial incentives.  See generally 18 U.S.C. § 981(a)(1)(G).

Under this statutory provision, and unlike other forfeiture provisions, a "substantial connection" between the Policy Benefits and Farook's terrorism crimes is not required.  Instead, the "nexus" required is that some causal relationship exist between the offense and the asset.  Here, as the verified complaint demonstrates, there is probable cause to believe that the Policy Benefits were generated as a direct result of the San Bernardino Attack, as he had planned, in that Farook died in the course of committing that attack.  However, should the Court disagree and decline to issue the requested arrest warrant in rem, the Court would lack jurisdiction over the Policy Benefits for purposes of this case.[1]

The fundamental answer to the Court's three questions is that, in its post-9/11 enactment of § 981(a)(1)(G), Congress passed a

---

[1] The government notes that after the Court issued the June 2 Order, the insurer filed an interpleader action in this district, Minnesota Life Insurance Company v. Rafia Farook, et al., Case No. 5:16-CV-01206-JFW (SPx), naming the United States, among others, as a party and including notice that the insurer will deposit the Policy Benefits with the Clerk of the Court on June 10, 2016.

3

1  statute broad enough to allow this Court, in the first instance, to

2  "arrest" the Policy Benefits thereby enabling the forfeiture case to

3  proceed rather than allowing a terrorist to use his death to enrich

4  his chosen beneficiary.  The government respectfully submits that

5  under the language and structure of § 981(a)(1)(G), and within the

6  framework of forfeiture law, this Court can and should issue an

7  arrest warrant for the assets.

8  **II.  ARGUMENT**

9  **A.  The Defendant Policy Benefits Are "Derived From" the**
   **Underlying Federal Crime of Terrorism.**
10

11  The verified complaint establishes probable cause to believe

12  that the Policy Benefits are "assets . . . derived from . . . any

13  Federal crime of terrorism against the United States, citizens or

14  residents of the United States, or their property."[2]  Taking the

15  facts alleged in the verified complaint as true, as the Court must,

16  Farook's horrific crimes constituted Federal crimes of terrorism.

17

18  [2] The applicable standard is whether the government has
established probable cause to believe that the property sought to be
19  seized is subject to forfeiture.  See generally Marine Midland Bank
v. United States, 11 F.3d 1119, 1125 (9th Cir. 1993); United States
20  v. Melrose East Subdivision, 357 F.3d 493, 504 (5th Cir. 2004).  The
government is not required to satisfy at the pleading stage its
21  ultimate burden of proving by a preponderance of the evidence that
the property is subject to forfeiture.  See United States v. Real
22  Property Located at 5208 Los Franciscos Way, 385 F.3d 1187, 1193 (9th
Cir. 2004).  An arrest warrant is properly issued if, based on the
23  totality of the circumstances, and with a "common sense view to the
realities of normal life," the Court finds that there is a "fair
24  probability" that the defendant assets are subject to forfeiture on
the grounds alleged.  See Illinois v. Gates, 462 U.S. 213, 238
25  (1983); United States v. $242,484.00 in U.S. Currency, 389 F.3d 1149,
1160 (11th Cir. 2004); see also United States v. Real Property 874
26  Gartel Drive, 79 F.3d 918, 922 (9th Cir. 1996) ("The government need
prove only that it had reasonable grounds to believe that the
27  property was involved in the alleged offenses, supported by less than
prima facie proof but more than mere suspicion")(internal quotes
28  omitted).

4

1   Further, the Policy Benefits are an asset.  Thus, the only possible

2   issue -- which the government understands to be the focus of the

3   Court's June 2 Order -- is whether the Policy Benefits are "derived

4   from" the terrorist attack during which Farook died.[3]

5        1.   Congress Designed § 981(a)(1)(G)(iii) to Sweep
          Extremely Broadly, Covering All Assets Derived From a
6          Terrorist Attack, Not Merely Proceeds

7        "In the interpretation of statutes, the function of the courts

8   is easily stated.  It is to construe the language so as to give

9   effect to the intent of Congress."  United States v. Am. Trucking

10  Ass'n, 310 U.S. 534, 542 (1940).  In the immediate aftermath of the

11  9/11 terrorist attacks, Congress enacted § 981(a)(1)(G) to establish

12  broad anti-terrorism civil forfeiture authority.  The question before

13  this Court is whether, in doing so, Congress intended to and did

14  provide a tool broad enough to reach the monetary rewards of an

15  insurance policy held by a terrorist and triggered by his death in

16  carrying out an act of terrorism.[4]  The answer is yes.

17  _____

18      [3] If this understanding is incorrect, the government
    respectfully requests leave to provide further briefing or amend the
19  complaint.

20      [4] A finding here that the allegations of the complaint
    establish probable cause to believe that the Policy Benefits are
21  forfeitable under § 981(a)(1) is not the end of the forfeiture
    process: the government ultimately must prove by a preponderance of
22  the evidence that the Policy Benefits are subject to forfeiture
    under § 983(c)(1), and claimants can intervene and assert defenses
23  to the forfeiture, including that they are innocent owners of the
    asset under § 983(d), or that the forfeiture is Constitutionally
24  excessive under § 983(g).  But those claims come later in the
    process, after the defendant asset is "arrested."  See United States
25  v. Real Property Located at 475 Martin Lane, 545 F.3d 1134, 1144
    (9th Cir. 2008); United States v. Ursery, 518 U.S. 267, 295-96
26  (1996) (Kennedy, J., concurring).

27      Thus, to hold that the Policy Benefits are covered by
    § 981(a)(1) (and therefore subject to seizure pursuant to § 981(b)),
28
                              5
                                      (footnote cont'd on next page)

1    Congress framed § 981(a)(1)(G) in sweeping terms, and subsection

2    (iii) is no different.  It authorizes the forfeiture of "all assets .

3    . . derived from . . . any Federal crime of terrorism."  18 U.S.C.

4    § 981(a)(1)(G)(iii) (emphasis added).[5]  The breadth of this provision

5    is clear not only from its terms but also from its historical context

6    and legislative history.  Congress was adamant that terrorists not be

7    allowed to use "the world-class services of the American financial

8    system to underwrite their deadly operations," much less use

9    terrorism as a means of enriching themselves or others.  147 Cong.

10   Rec. 20,028 (2001) (Rep. Oxley).

11       In interpreting § 981(a)(1)(G)(iii), the Court must "focus[] on

12   'the language itself, the specific context in which that language is

13   used, and the broader context of the statute as a whole.'"  United

14   States v. Havelock, 664 F.3d 1284, 1289 (9th Cir. 2012) (quoting

15

16

17   _____

18   does not necessarily mean that the government will ultimately
     prevail in the civil judicial forfeiture action, but merely that the
19   benefits can be held by the government while any claims to the asset
     are resolved.
20
          [5] That Congress chose to enact § 981(a)(1)(G) as a civil (in
21   rem) rather than a criminal (in personam) forfeiture provision
     reflects an intent that the terrorism section apply beyond
22   circumstances in which a defendant suffers a criminal conviction
     because civil forfeiture includes no such requirement.  See Libretti
23   v. United States, 516 U.S. 29, 39 (1995) (criminal forfeiture is part
     of a defendant's sentence following conviction of a substantive
24   criminal offense); United States v. Davenport, 668 F.3d 1316, 1320
     (11th Cir. 2012) (criminal forfeiture applies to property with a
25   nexus to the crime of conviction).  The distinction is important in
     the terrorism context, where, as here, a terrorist intends to
26   "martyr" himself during the course of the terrorist act.  In such a
     case, criminal prosecution against the deceased terrorist is
27   impossible and any forfeiture remedies must be civil.
28

                                     6

1    <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 341 (1997)).[6]  The statute

2    must be "construed so that effect is given to all its provisions, so

3    that no part will be inoperative or superfluous, void or

4    insignificant."  <u>Hibbs v. Winn</u>, 542 U.S. 88, 101 (2004).  Further,

5    the Court should be guided by the principles set forth by the Supreme

6    Court in <u>Russello v. United States</u>, 464 U.S. 16 (1983), which

7    interpreted the narrower RICO forfeiture provisions to cover

8    insurance benefits paid as the result of an arson.  Two of <u>Russello</u>'s

9    holdings particularly illustrate the applicability of

10   § 981(a)(1)(G)(iii) here.

11       <u>First</u>, <u>Russello</u> made clear that in interpreting the terms of the

12   RICO forfeiture provision, courts could never lose sight of the fact

13   that "the RICO statute was aimed at organized crime's economic power

14   in all its forms."  464 U.S. at 25.  The statute's terms must

15   therefore be read as "broad," so as "to fulfill that aim."  <u>Id.</u>

16   Thus, the Court rejected a narrow interpretation of the forfeiture

17   provision that could "blunt the effectiveness of the provision in

18   combatting illegitimate enterprises."  <u>Id.</u> at 24.

19       That foundational principle applies with even more force here.

20   Prior to the enactment of § 981(a)(1)(G), the RICO forfeiture

21   provisions were the most expansive in the United States Code.  That

22   the forfeiture provisions related to crimes of terrorism were written

23   to be even broader was in recognition of the fact that "[i]t is

24   _____

25       [6] The plain meaning of "derive" is broad and varied, but has as
     its basic gist "to have or take origin: originate: stem, emanate,"
26   with the exemplary phrase "stories deriving from his experiences in
     Africa."  <u>Webster's Third New International Dictionary</u> 608 (1961).
27   The government submits that this plain meaning alone is sufficient to
     conclude that the Policy Benefits "derived from" (<u>i.e.</u>, had their
28   origin in) Farook's death in his terrorist attack.

                                      7

'obvious and unarguable' that no government interest is more compelling than the security of the Nation." <u>Haig v. Agee</u>, 453 U.S. 280, 307 (1981).  Congress deliberately designed the law to insure that "terrorism will be fought in the financial theatre as aggressively as the war now being waged by our brave men and women in uniform."  147 Cong. Rec. 20,444 (Rep. Oxley).[7]  This language is strikingly similar to the legislative history that compelled a broad reading of the RICO statute in <u>Russello</u>, 464 U.S. at 27-28.  Here -- unlike with RICO -- the war was quite literal and the necessity all the more acute.

    <u>Second</u>, <u>Russello</u> explained that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  464 U.S. at 23.  Thus, the presence of limiting language in one provision underscores the breadth of any other provision in which that limitation is absent.  <u>Id.</u>

       2.  <u>The Plain Language of § 981(a)(1)(G)(iii) Is Broader Than Other Provisions In § 981 And Is Not Limited To Proceeds</u>

    Here, there is a striking distinction between subsection (G)(iii) and other subsections of § 981: subsection (G)(iii) authorizes forfeiture of "all property . . . derived from" the triggering offense, whereas every other provision authorizes

---

    [7] The legislative history shows that Congress was generally concerned with addressing "inadequate statutory provisions that . . . make forfeitures more difficult" and "strengthening" existing forfeiture mechanisms.  Pub. L. No. 107-56, §§ 302(a)(8), (b)(1), (b)(3), 316, 319, 320, 115 Stat. 272 (codified in scattered sections of the United States Code).

forfeiture only of "any property . . . derived from <u>proceeds</u>

<u>traceable to</u>" or "proceeds <u>obtained from</u>" a triggering offense.  18

U.S.C. § 981(a)(1)(B), (C), (H), (I) (emphasis added); <u>see also,</u>

<u>e.g.</u>, 18 U.S.C. § 1963(a)(3) (RICO).[8]  Congress thus intended the

reach of § 981(a)(1)(G)(iii) to extend beyond mere "proceeds" and to

encompass <u>all</u> assets derived from the offense.[9]

Taken together, the established canons of statutory construction

and the particular principles set forth in <u>Russello</u> establish a

framework for how "all assets . . . derived from" Farook's terrorist

attack must be construed:

(1) The phrase must be construed broadly, consistent with the

language's breadth (<u>i.e.</u>, "all assets," "any crime of terrorism") and

the urgent necessity that Congress was addressing.

(2) It must reach assets not covered by other provisions of

§ 981(a)(1) because to do otherwise would "deny effect to . . . part

of [§ 981(a)(1)'s] language."  <u>See generally</u> <u>Higa v. Transocean</u>

<u>Airlines</u>, 230 F.2d 780, 784 (9th Cir. 1956).  Therefore, the "derived

from" provision must reach beyond those assets:

(a)  belonging to Farook himself, § 981(a)(1)(G)(i);

---

[8] The term "any" is typically construed as broadly as the term
"all."  <u>E.g.</u>, <u>Do Sung Uhm v. Humana, Inc.</u>, 620 F.3d 1134, 1153 (9th
Cir. 2010) ("The word 'any' is generally used in the sense of 'all'
or 'every' and its meaning is most comprehensive." (quoting <u>Fleck v.</u>
<u>KDI Sylvan Pools, Inc.</u>, 981 F.2d 107, 115 (3d Cir. 1992)).  To the
extent any distinction can be drawn between them, however, it is that
"all" suggests even greater breadth.  <u>Cf.</u> <u>Clapp v. Heiner</u>, 51 F.2d
224, 226 (3d Cir. 1931).

[9] For that reason, the government respectfully submits that the
Court's first question differs from the statute insofar as the
question asks the government to establish probable cause to believe
that the Policy Benefits represent "<u>proceeds</u> [that] were 'derived
from' the terrorist act."  Order at 2 (emphasis added).  As noted,
§ 981(a)(1)(G)(iii) is expressly not limited to "proceeds."

9

(b)  "acquired . . . with the intent . . . of supporting, planning or concealing" terrorism, § 981(a)(1)(G)(ii);

(c) "involved in, or used or intended to be used to commit" terrorism, § 981(a)(1)(G)(iii); and

(d) associated with financing terrorism, § 981(a)(1)(H).

(3) It must reach beyond the attack's "proceeds," as that limitation was removed from § 981(a)(1)(G).  Thus, it cannot be narrower than -- and indeed must be broader than -- "all property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."  18 U.S.C. § 981(a)(2)(A) (defining "proceeds" for "cases involving . . . unlawful activities").

Given that "assets . . . derived from" Farook's terrorist attack must include assets belonging to third parties who are not themselves involved in the underlying violation, and must include assets that were neither involved in the offense nor directly obtained during the offense, § 981(a)(1)(G)(iii) must reach the benefits of Farook's life insurance policy.  Indeed, among the kind of assets not covered by other provisions of § 981(a)(1), it is hard to imagine anything with a closer "nexus" to the offense than the defendant assets in this case.  The Policy Benefits are intimately connected both to the terrorist (the insured) and his crimes of terrorism (the cause of his death).

To return to the question with which the analysis began, it is indisputable that Congress would have intended to prevent Farook from enriching his designated beneficiaries through his death in a terrorist attack, or at least to provide the government the means to

10

1  arrest the assets in the first instance so that any claimants could

2  have their claims adjudicated by a court.  At a general level, the

3  sheer breadth of § 981(a)(1)(G)'s provisions -- for example,

4  authorizing the forfeiture of <u>all</u> of a terrorist's property, whether

5  related to the offense or not, <u>id.</u> (G)(i)[10] -- along with the

6  historical context and legislative history, establish Congress's

7  intent to sweep as broadly as possible.  <u>See Russello</u>, 464 U.S. at

8  24, 25.[11]  At a specific level, there has long been acute concern

9  about terrorists being motivated by life insurance policies

10  benefitting their families.  <u>See, e.g.</u>, <u>Humanitarian Law Project v.</u>

11  <u>Reno</u>, 205 F.3d 1130, 1136 (9th Cir. 2000) (money paid "to the

12  families of those killed while carrying out terrorist acts . . .

13  mak[es] the decision to engage in terrorism more attractive");

14  Matthew Levitt, <u>Hamas: Politics, Charity, and Terrorism in Service of</u>

15

16      [10] The provision does not even require the actual commission of a
17  terrorist act: <u>planning</u> alone is enough to trigger the forfeiture of
    an individual's assets under § 981(a)(1)(G)(i).

18      [11] To the extent limiting principles are sought for the broad
19  sweep of § 981(a)(1)(G)'s language and policy, those principles are
    already deeply embedded in the statutory forfeiture scheme.  <u>See</u> 3A
20  Sutherland, <u>Statutory Construction</u> § 68:5 (7th ed.) ("The various
    parts of a statutory enactment are understood in the context of the
    statutory framework as a whole, which includes the pre-existing
21  common law . . . and the Constitution.").  In some cases -- though
    certainly not in this case -- limits could be found in the statutory
22  innocent owner defense in § 983(d), the Due Process Clause of the
    Fifth Amendment, or the Excessive Fines Clause of the Eighth
23  Amendment, which is codified in § 983(g).  The existence of arguments
    that can be raised by a claimant later in the action further counsels
24  against importing extratextual limitations into § 981(a)(1)(G) or
    reading "derived from" narrowly, contrary to Congressional intent.
25  <u>Cf.</u> <u>Russello</u>, 464 U.S. at 21-29.

26      The Eighth Amendment's limitations help underscore the propriety
    of applying § 981(a)(1)(G) here, for the forfeiture of the benefits
27  of a mass-murdering terrorist's life insurance policy plainly
    "bear[s] some relationship to the gravity of the offense" and is not
28  "grossly disproportional" to the crime.  <u>United States v. Bajakajian</u>,
    524 U.S. 321, 334 (1998).

                                    11

Jihad 178 (Yale Univ. Press 2007) ("[T]hese funds [paid to surviving family members] amounted to an annuity or life insurance policy for Hamas terrorists and served as a financial incentive . . . to engage in acts of terror.").

>        3.   Farook's Policy Benefits Have a Close Nexus With And Are Thus Derived From His Terrorist Crimes Under Any Standard

Where property has a causal connection with, or an origin in, an act of terrorism, it is "derived from" terrorism and therefore forfeitable under § 981(a)(1)(G)(iii).  Indeed, even in narrower civil forfeiture statutes, many courts have required only a "but-for" causal relationship between the crime and the asset's existence.  See United States v. Horak, 833 F.2d 1235, 1242-43 (7th Cir. 1987) (under 18 U.S.C. § 1963(a)(1) of the RICO forfeiture scheme, "in order to win a forfeiture order, the government must show [the criminal acts] were a cause in fact of the acquisition or maintenance of [the property]"); see also, e.g., United States v. DeFries, 129 F.3d 1293, 1313 (D.C. Cir. 1997) (in which the Court expanded the "but-for" test to include forfeitures sought under § 1963(a)(3), authorizing the forfeiture of any property "constituting, or derived from, any proceeds . . . obtained, directly or indirectly, from" racketeering activity (emphasis added)); United States v. Angiulo, 897 F.2d 1169, 1213 (1st Cir. 1990); United States v. Olfchinick, 883 F.2d 1172, 1183 (3rd Cir. 1989); United States v. Porcelli, 865 F.2d 1352, 1365 (2d Cir. 1989) (applying "but for" test to assess "nexus between property and [unlawful activity]").

But even if the Court were to require some greater nexus, such as proximate causation -- which would contradict Congress's intent as expressed in the statutory text and the legislative history and break

from established forfeiture practice -- the allegations of the complaint would still establish probable cause.

Here, Farook -- an adherent and promoter of violent jihadist ideology[12] teaching that "death while furthering jihad will result in martyrdom" -- began planning to commit terrorist attacks at least as early as 2011 and obtained life insurance coverage "after [he] initiated plans to conduct" violent attacks, including after acquiring two of the firearms used on December 2nd. (Complaint ¶¶ 8, 12, 16, 19(f).) He expected to die in the course of the San Bernardino Attack and he did.[13] (Complaint ¶¶ 8, 15, 18, 19(g).) The Policy Benefits became payable upon his death. (Complaint ¶ 20). That is, but for his commission of the Federal crimes of terrorism described in the complaint, there would be no death benefits to recover. And as Humanitarian Law Project and common sense dictate, there is a practical and moral connection between a terrorist's death benefits and his death in the cause of terrorism. The defendant Policy Benefits are therefore derived from qualifying triggering

---

[12] One of the goals of violent jihad is the pursuit of holy war against the United States in retaliation for government policies such as support of Israel. See, e.g., United States v. Rahman, 189 F.3d 88, 104 (2d Cir. 1999). Farook's execution of the San Bernardino Attack furthered a violent jihadist agenda of retaliation against the government. A defendant's actions are "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" within the meaning of § 2332b(g)(5) where those actions included "advancing jihadist propaganda," as well as "trying to offer himself as a fighter and supporting terrorism and extremism by 'attempting to be part of it on the battlefield, and supporting those who would [engage in jihad].'" United States v. Hassan, 742 F.3d 104, 149 (4th Cir. 2014).

[13] The government submits that it need not establish Farook obtained the insurance policies with the intent of triggering them through his death in a terrorist attack, but the record certainly supports that inference.

1    offenses within the meaning of § 981(a)(1)(G)(iii) and are subject to

2    forfeiture.

3          Similarly, although proximate causation is not required, the

4    verified complaint's allegations establish that Farook's death was

5    the foreseeable outcome of his commission of mass murder in the cause

6    of violent jihad, and there is likewise little reason to think that

7    Farook would have died otherwise on December 2, 2015 had he not

8    engaged in the San Bernardino Attack.  The generation of the Policy

9    Benefits therefore was equally foreseeable if not intended as that is

10   the express purpose of life insurance.  In short, even under a

11   proximate cause test, the Policy Benefits would remain derived from a

12   qualifying offense and thus subject to forfeiture.

13         For all of these reasons, the government submits that the

14   allegations of the complaint amply establish probable cause to

15   believe that the Policy Benefits are subject to forfeiture pursuant

16   to § 981(a)(1)(G)(iii) on the ground that they were "derived from"

17   the terrorist crimes that ended with Farook's death.  The proposed

18   arrest warrant in rem should issue.

19         **B.    The Substantial Connection Test Does Not Apply to
               Forfeiture Claims Against Assets Derived From Terrorism**

20

21         The Court's second inquiry was whether the government is

22   required to establish, pursuant to 18 U.S.C. § 983(c)(3), a

23   "substantial connection" between the Policy Benefits and the San

24   Bernardino Attack.  There is no such requirement.  Section 983(c)(3)

25   is expressly limited to circumstances in which the government seeks

26   to forfeit property "used to commit or facilitate" the underlying

27   offense, or that "was involved in the commission" of the offense.

28   The government proceeds under neither theory here.  Rather, as noted,

                                    14

the government's theory is that the Policy Benefits were "derived from" the underlying Federal crimes of terrorism.

Congress has created essentially four types of forfeiture authority in the United States Code: (1) authority allowing for the forfeiture of proceeds or property "derived from" a triggering offense; (2) authority allowing for the forfeiture of property that "facilitates" a triggering offense; (3) authority allowing for the forfeiture of property that is "involved in" a triggering offense; and (4) authority allowing for the forfeiture of property that "affords a source of influence" over certain persons, entities or enterprises.   Section 983(a)(1)(G)(iii) provides for three separate forms of forfeiture, targeting assets "derived from," "facilitating," or "involved in" a crime of terrorism.   The government seeks forfeiture of the Policy Benefits solely on the first of these theories.

Section 983(c)(2)'s "substantial connection" requirement is expressly limited to the second and third kinds of forfeiture: "if the Government's theory of forfeiture is that the property <u>was used to commit or facilitate</u> the commission of a criminal offense, or <u>was involved in</u> the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense."  (Emphases added.)  This limitation is plain and unambiguous, is affirmed in settled precedent, <u>see, e.g.</u>, <u>United States v. $125,938.62 Proceeds of Certificates of Deposit</u>, 537 F.3d 1287, 1293 n.2 (11th Cir. 2008) (when proceeding under a proceeds theory, "the Government was required to demonstrate only that the funds were derived from or were traceable to, any proceeds

obtained directly or indirectly from the embezzlement of public funds from the Nicaraguan treasury."), and reflects sound policy.

The rationale behind the "substantial connection" requirement is that, absent such a limitation, a criminal could cause the property of a third party to be targeted for forfeiture property merely by using it in the commission of a crime that triggers forfeiture, for example by arranging a single illicit drug transaction to occur at a family member's house while the owner is out of town. See United States v. Santoro, 866 F.2d 1538, 1542 (4th Cir. 1989) (the requirement is "consonant with the congressional intent that the instrumentalities of [crime] be reached, while ensuring that property only fortuitously connected with [crime] be preserved"); accord United States v. One 1986 Ford Pickup, 56 F.3d 1181, 1186 (9th Cir. 1995); United States v. One Parcel . . . 916 Douglas Ave., 903 F.2d 490, 494 (7th Cir. 1990). That rationale is absent in "derived from" cases where the relationship between the crime and the asset is not "fortuitous" but causal.[14]

The "nexus" required is not a "substantial connection" but rather the nexus implicit in the "derived from" test, discussed above:  namely, that some causal relationship exist between the

_____

[14] For that reason, even if "derived from" forfeiture were not expressly beyond the reach of the "substantial connection" requirement, an asset forfeited on the ground that it "derived from" the offense or the proceeds of the offense would necessarily have a substantial connection to the offense.  See, e.g., United States v. $62,552.00 in U.S. Currency, 2015 WL 251242, at *3 (D. Mass. Jan. 20, 2015) ("The substantial connection 'requirement will generally be satisfied if the items under forfeiture are shown to be proceeds of the illegal activity [or] derived from such proceeds . . . ." (quoting United States v. Real Property with any Improvements Thereon Located at 40 Clark Road, Sandisfield, Mass., 52 F. Supp. 2d 254, 261 (D. Mass. 1999)).

16

1   offense and the asset.  Here, as the government has demonstrated,

2   there is probable cause to believe that the Policy Benefits were

3   generated as a direct result of the San Bernardino Attack, insofar as

4   Farook died during that attack, thereby triggering the obligation to

5   pay under his insurance policy.  While the government should not be

6   required to demonstrate Farook's mental state -- which is separate

7   from the extrinsic derivation of the assets from his death in the

8   attack -- the government also submits that there is probable cause

9   that Farook foresaw and even intended to die during the attacks.

10       Under those circumstances, there is an ample nexus between the

11  Policy Benefits and the crime, a nexus sufficient to satisfy but-for

12  causation, proximate causation, or the substantial connection test.

13       **C.    If the Court Denies the Arrest Warrant In Rem, It Must
              Terminate the Case**

14

15       The Court's third inquiry was whether it can exercise

16  jurisdiction over the Policy Benefits if the arrest warrant in rem

17  does not issue.  As explained in the government's ex parte

18  application for the arrest warrant, where -- as here -- the

19  government does not have custody of the defendant res prior to the

20  filing of its verified complaint, the Court's in rem jurisdiction

21  over the property is not perfected until the warrant's execution.

22  See Penn Gen. Casualty Co. v. Pennsylvania, 294 U.S. 189, 196 (1935)

23  (in rem jurisdiction attaches when a complaint is filed and "process

24  subsequently issues in due course"); Alyeska Pipeline Service Co. v.

25  Vessel Bay Ridge, 703 F.2d 381, 384 (9th Cir. 1983) ("Jurisdiction

26  over the res is obtained by arrest under process of the court.  In

27  absence of an arrest, no decree in rem can be rendered against the

28  res.").  For that reason, the Court's jurisdiction to proceed to the

1   merits of this case, and the government's right as a party to bring

2   the action, turns upon first issuing the warrant.

3        Accordingly, should the Court deny the government's arrest

4   warrant, the government respectfully requests that the Court order

5   the case dismissed <u>without prejudice</u> so that the government may move

6   to stay the interpleader action and have an opportunity to pursue

7   appellate review and/or attempt to replead the complaint.

8   **III. CONCLUSION**

9        The defendant Policy Benefits -- which accrued as a consequence

10  of Farook's death in carrying out a terrorist attack -- are exactly

11  the kind of asset that Congress intended to reach, and did reach, in

12  enacting § 981(a)(1)(G)(iii).  That the Policy Benefits are

13  forfeitable is clear under the broad statutory language, the need to

14  give purpose to every forfeiture provision Congress included and

15  limitation it omitted, the legislative history, and historical

16  context.  The government respectfully submits that the Court should

17  issue the warrant to arrest the Policy Benefits, such that the

18  forfeiture process can proceed as Congress intended, allowing the

19  government to

20  ///

21  ///

22  ///

23

24

25

26

27

28

1  prove forfeitability and any claimants to attempt to establish any

2  defense they may have.

3  Dated: June 9, 2016                 Respectfully submitted,

4                                      EILEEN M. DECKER
                                       United States Attorney
5
                                       LAWRENCE S. MIDDLETON
6                                      Assistant United States Attorney
                                       Chief, Criminal Division
7
                                       STEVEN R. WELK
8                                      Assistant United States Attorney
                                       Chief, Asset Forfeiture Section
9
                                       _____
                                             /s/
10                                     FRANK D. KORTUM
                                       Assistant United States Attorney
11
                                       Attorneys for Plaintiff
12                                     UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28